NOT PRECEDENTIAL

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN MIX | Crim. Action No. 24-741 (RK)<br><br>**OPINION** |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court upon Defendant John Mix's ("Defendant" or "Mix") Omnibus Pretrial Motion (the "Motion"). ("Mot. Br.," ECF No. 21.) The United States of America (the "Government") opposed the Motion, ("Opp. Br.," ECF No. 25), and Defendant replied ("Reply Br.," ECF No. 28). On July 15, 2025, the Court held an evidentiary hearing wherein it heard oral argument with respect to the constitutional aspects of the Motion and took testimony from three fact witnesses. ("Hearing Tr.," ECF No. 39.) Thereafter, each party submitted a post-hearing brief. ("Gov't Supp. Br.," ECF No. 40; "Def. Supp. Br.," ECF No. 41.) Having considered the parties' arguments, as well as the evidence presented at the July 15, 2025 hearing, Defendant's Motion is **GRANTED** in part and **DENIED** in part.

### I.  BACKGROUND

#### A.  FACTUAL BACKGROUND[1]

This criminal case involves the recovery of an illegal handgun and ammunition from Defendant's vehicle following a traffic stop. For purposes of the subject Motion, it is not disputed

---

[1] This factual recitation derives from testimony and exhibits submitted during the July 15, 2025 evidentiary hearing. To the extent there are facts within this recitation that are disputed, the Court addresses the relevant disputes in the "Discussion" section of this Opinion.

that Defendant is a person having previously been convicted of "a crime punishable by imprisonment for a term exceeding one year."[2] (ECF No. 13); *see* 18 U.S.C. § 922(g)(1).

1. Impetus for the Traffic Stop

On August 2, 2023 at approximately 7:00 p.m., Sergeant Roberto Cancel ("Cancel") was working in the Gang Intelligence Unit of the Passaic Police Department. (Hearing Tr. at 33:11–34:02, 36:09–17.) He was working as a plain-clothes officer in an unmarked police vehicle with a partner, Officer Joshua Medina. (*Id.*) Cancel received a tip via a phone call from a "citizen informant," who reported that a narcotics transaction was going to take place in the area of Third Street and South Street in Passaic. ("Cancel Report," Gov't Ex. 3,[3] at 2.) The informant reportedly "stated that a white male inside of a silver . . . Chrysler convertible bearing NJ registration Y97KRS was going to purchase narcotics from a black male who reside[d] in the area." (*Id.* at 2.) The informant wished to remain anonymous but explained that he had "observed the male inside of the Chrysler convertible purchase narcotics from the area . . . on 08/01/2023 [the prior day] from a black male . . . operating a black . . . Lexus bearing NJ license plates fully tinted out." (*Id.*)

After receiving the tip, Cancel went to Third Street and South Street where he conducted a "very short surveillance" and observed a double-parked silver Chrysler with a registration plate matching that provided by the informant. (Hearing Tr. at 39:04–20.) He did not observe a black Lexus, however, and when a marked patrol unit drove by, the Chrysler left the area. (*Id.* at 39:09–13.) Then, Cancel received another call from the citizen informant who stated that both vehicles were in the area of *Fifth* Street and South Street. (*Id.* at 39:21–40:04.)

---

[2] More specifically, the Government has represented that the predicate felony offense it will seek to prove at trial is Defendant's 2016 conviction in Passaic County Superior Court for (i) possession with intent to distribute a controlled dangerous substance in the 2nd degree, and (ii) possession with intent to distribute a controlled dangerous substance within 1,000 feet of a school zone in the 3rd degree. (ECF No. 43.)

[3] Unless otherwise noted, the Court uses the exhibit numbering set forth at the July 15, 2025 evidentiary hearing.

Proceeding to Fifth Street and South Street, Cancel saw both the same silver Chrysler as before as well as a black Lexus. ("Garcia Report," Gov't Ex. 1, at 2.) He observed both cars to be double-parked on the street. (*Id.*; *see* Hearing Tr. at 40:09–14, 42:07–12 (testifying the vehicles were parked in close proximity approximately "two or three car lengths" apart).) With respect to the black Lexus, Cancel reported that he also observed that vehicle to have fully-tinted front windows. (Cancel Report at 2.) At that time, Cancel approached the double-parked silver Chrysler, while Passaic Police Officers Miguel Garcia ("Garcia") and Paul Zapata ("Zapata") approached the double-parked black Lexus. (Hearing Tr. at 40:08–41:01.)

   2.  Stop of the Silver Chrysler

The entirety of Cancel's stop of the silver Chrysler lasted approximately two-and-a-half minutes. ("Cancel BWC," Gov't Ex. 9, at 19:11:53–19:14:32.) At the start of the stop, the driver of the Chrysler, a white man named "E.W."[4], complied with Cancel's requests for his license and registration. (*Id.* at 19:11:53–19:12:33.) Cancel then had E.W. step out of the Chrysler and spoke to him in front of the vehicle. (*Id.* at 19:12:33–19:13:00.) Cancel told E.W. to "stop buying drugs in Passaic," and that Cancel "kn[e]w" what the driver was in the area for.[5] (*Id.* at 19:13:00–19:13:10.) Cancel told E.W., "[T]he person that was going to sell you the drugs is in the car behind you, alright?" (*Id.* at 19:13:31–19:13:38.) E.W., appearing confused, nodded but then shook his head and replied, "I don't know." (*Id.*; *see id.* at 19:13:38–19:13:39 (Cancel responding "Listen, I'm just letting you know.").) Ultimately, after briefly reviewing E.W.'s license and registration, Cancel told him he was free to go. (*Id.* at 19:14:05–19:14:32.) E.W. later received a summons for double-parking. (Hearing Tr. at 66:16–22.)

---

[4] The Court uses only the initials of the driver of the silver Chrysler as he was not charged with any criminal activity during the incident.

[5] E.W.'s driver's license listed his address as being in Lodi, New Jersey, which Cancel testified was "several towns away from the City of Passaic." (Cancel Report at 1; Hearing Tr. at 65:24–66:01.)

During the course of his stop of the Chrysler, Cancel testified that, within earshot, he heard Garcia and Zapata's discussion with the driver of the black Lexus "getting loud." (Hearing Tr. at 40:23–41:01; *id.* at 42:18–20 ("I heard the officers being loud, and I heard whoever was the occupant of the vehicle being loud as they were ordering him out of the vehicle."); *see also* Cancel BWC at 19:14:07 (noticeable yelling in background).) Because Cancel "wanted to make sure that [he] deescalated the situation," Cancel testified that he "cut the driver of the Chrysler loose" as he "felt like it was [his] duty to make sure that the officers that [he] supervised didn't use force or get into something that they didn't need to get into." (Hearing Tr. at 41:02–05, 42:02–06, 42:09–12.)) He then approached Garcia and Zapata, who were still conducting the stop of the Lexus. (Cancel Report at 2.)

### 3.  Stop of the Black Lexus

When officers first arrived on-scene, Garcia—who was also working as a plain-clothes officer in an unmarked vehicle as part of the Gang Intelligence Unit—observed the black Lexus to be double-parked in what he knew to be a "high narcotic trafficking area." (Garcia Report at 2; Hearing Tr. at 147:23–148:09, 150:25–151:01 ("[The Lexus] was stopped in the middle of the road, double-parked.").) Indeed, Garcia had made "numerous narcotics arrests" in that area of Passaic before.[6] (Garcia Report at 2; *see also* Hearing Tr. at 150:14–15 ("I routinely patrol the area because it's a high drug trafficking area, high in crime as well.").) Along with being double-parked, Garcia also observed "[t]he front driver side, front passenger's side, and the rear" windows of the Lexus to be "heavily tinted." (Hearing Tr. at 151:02–05.)

---

[6] Cancel separately testified that the area where the stop occurred was "high in criminal activity, specifically drug activity" and "most . . . . arrests come from that area." (Hearing Tr. at 45:25–46:07.)

After activating his police lights in order to "enforce" the double-parking and window-tint traffic violations (*id.* at 151:06–14), Garcia observed Defendant John Mix,[7] a Black man and the driver of the Lexus, "ma[k]e several furtive movements reaching towards the front passenger seat compartment in a manner consistent with attempting to conceal contraband or a weapon."[8] (Garcia Report at 2.) Garcia later elaborated that he specifically saw Mix "reaching over the center console into the area of the glove box," which he construed as Mix "attempting to reach for a weapon, possibly reach for a weapon or conceal a weapon or contraband." (Hearing Tr. at 153:14–16, 154:09–10.) These movements purportedly lasted "seconds." (*Id.* at 181:23–182:2.)

Corroborating his observation of furtive movements inside the vehicle, when Garcia approached the passenger side of the Lexus, he shouted at Mix "to keep [his] hands up." ("Garcia BWC," Gov't Ex. 10, at 19:11:40–19:11:49.) Mix immediately lowered his front passenger window and gestured to a wallet in his hand. (*Id.* at 19:11:45–50; Cancel BWC at 19:15:50–57 (Mix explaining "I pulled out my license," in response to Cancel referencing his movements); *see* Garcia Report at 2 (noting Mix "advised [Garcia] that he was attempting to reach for his wallet[,] however Mr. Mix appeared to remove his wallet from his rear pant pocket.").)

Upon asking Mix to lower the rest of the Lexus's windows, Garcia observed Mix "hesitate[]" and "appear[] to be angered by [his] command." (Hearing Tr. at 155:02–05; *see* Garcia BWC at 19:12:13–19:12:23 (Mix responding "[d]on't act like an asshole" to Garcia's requests to

---

[7] Cancel testified that he knew Mix did not live at the location of the incident. (Hearing Tr. at 45:17–19; *see also id.* at 173:03–08 (Garcia testifying that the distance between Mix's residence and the location of the incident was an estimated "five-minute walk").)

[8] Garcia explained that he "made this observation through the front windshield that did not contain illegal window tints as [his] police vehicle was positioned in front of the suspect vehicle." (Garcia Report at 2.) While Cancel's police report indicated the Lexus had "fully tinted front windows" (Cancel Report at 2), he clarified at the evidentiary hearing that the front windshield was only "lightly tinted." (Hearing Tr. at 69:06–08.) This is supported by Garcia's testimony that the Lexus's side windows were "heavily tinted," but the front windshield was only "slightly tinted." (Hearing Tr. at 151:02–05, 176:20–177:01.)

lower the windows).) Nonetheless, Mix ultimately complied and apologized. (Garcia BWC at 19:12:25–35.) Garcia then peered into the back of the Lexus which appeared empty aside from a large bag of dog food laying on the rear driver-side passenger seat.[9] (*Id.* at 19:13:23–19:13:26.)

Mix next refused to comply with the officers' requests for him to exit the Lexus. Garcia's BWC footage depicts Mix yelling and repeatedly and loudly requesting that the officers call their supervisor because he "was not stepping out of his car." (*Id.* at 19:14:35–19:14:45.) Once Cancel approached the Lexus, he too observed Mix to be "very argumentative" and "upset."[10] (Hearing Tr. at 46:10–17.) Contrary to his conversation with E.W., Cancel told Mix that E.W. informed him that he was going to purchase drugs from Mix, which was bolstered by a tip from a "CI." (Cancel BWC at 19:15:32–19:15:36.) After a discussion with Garcia wherein Garcia informed Cancel about Mix's furtive movements and his "hostil[ity]" regarding exiting the Lexus, Cancel threatened to "lock [Mix] up" if he did not exit the vehicle. (*Id.* at 19:15:05–20; Hearing Tr. at 46:10–17.) Mix then complied. (Hearing Tr. at 46:24–25.)

Another officer at the scene conducted a pat-down frisk of Mix, which did not reveal any weapons. (*Id.* at 82:20–83:01.) Mix was not asked "to show his pockets" or remove all the items "on his person." (*Id.* at 83:02–07.) There was also a visual sweep for weapons conducted of the area inside the Lexus "where Mr. Mix was observed to be making movements," but that "yield[ed] negative findings[.]" (Garcia Report at 2; Hearing Tr. at 185:06–11 (Garcia confirming neither he nor Cancel found anything during their visual sweep of the Lexus).) Notably, and perhaps

---

[9] While Garcia did not recall seeing it at the time, there was also marijuana in the Lexus. (Hearing Tr. at 198:05–06; Garcia Supp. Report at 2.)

[10] This was neither Garcia's nor Cancel's first interaction with Mix. Garcia had previously arrested Mix for narcotics possession, and Cancel previously (i) arrested Mix on a narcotics charge, (ii) prevented Mix from fleeing a domestic violence incident, and (iii) stopped Mix "for various motor vehicle violations" over the course of "multiple years." (Hearing Tr. at 45:11–16, 155:21–156:03.)

obviously, the officers' visual sweep did not include opening any of the Lexus's compartments, including its glove box. (Garcia BWC at 19:16:37–19:17:06.)

At this point, particularly given Mix's furtive movements, it was determined that the stop "presented reasonable articulable suspicion that criminal drug activity was present," and Cancel requested a narcotics K-9. (Garcia Report at 2; Hearing Tr. at 185:17–20; Cancel BWC at 19:17:22–19:17:29.) As everyone on scene waited for the K-9 to arrive, Garcia reported that Mix "called his lawyer . . . and began to smoke marijuana." (Garcia Report at 2.) The officers did not ask any investigative questions of Mix while they waited. (Hearing Tr. at 186:23–187:1.)

After waiting approximately 25–30 minutes, Officer Jason Katz ("Katz") and K-9 "Koen" of the Passaic County Sheriff's Department arrived. (Cancel BWC at 19:17:22–19:41:20; "Katz Report," Gov't Ex. 13.) Garcia first entered the Lexus to turn off its ignition. (Hearing Tr. at 126:10–13, 188:03–10.) Then, as per Katz's report, Koen

> conducted an on-lead exterior 'sniff', starting at the driver's side headlamp and working in a counterclockwise direction around the vehicle. While in the area of the rear driver's side passenger door handle, Koen showed a positive indication for the presence of narcotic odor, specifically by taking a seated position and pointing his nose towards the door handle.[11]

(Katz Report at 1.) Garcia's BWC footage depicts Katz and Koen circling the Lexus twice, and Koen ultimately sitting down next to the rear driver's side passenger door. (Garcia BWC at 19:41:50–19:46:05; Hearing Tr. at 125:15–21 ("[Koen] did indicate on the rear door handle by taking a seated position, pointing his nose towards the area of the door handle . . . [which signified]

---

[11] Cancel testified that during Koen's circling of the Lexus, "there was approximately five to six people that came in support of Mr. Mix and were attempting to maybe obstruct [the officers'] attention away from what [they] were doing." (Hearing Tr. at 49:19–50:09.) He stated the small crowd was "recording and yelling" and "heckling officers on scene." (Id. at 50:07–09, 19–22.) While this observation did not make its way into Cancel's police report (see id. at 88:10–17), it was corroborated at least in part by Katz who testified that he "noticed [Koen] was getting a little distracted by the people around him." (Id. at 128:20–129:09.) A group of four to five people can also be seen and heard on Garcia's BWC. (Garcia BWC at 19:41:52–19:46:00.) No one was ultimately ticketed for obstruction or disorderly conduct. (Hearing Tr. at 88:23–25.)

[t]he presence of a narcotic odor").) Notably, prior to his alert, Koen twice jumped up to the windowsill of the Lexus's open front windows, and his head briefly crossed into the interior of the vehicle at least once. (*See* Garcia BWC at 19:44:17–25.)

After Cancel learned of Koen's positive alert, he called a county prosecutor, and it was determined that the Lexus would be towed to the basement of Passaic Police Department to "wait for the application and approval of the search warrant for [a] search of the vehicle." (Hearing Tr. at 52:06–09.) Upon informing Mix of the plan, Mix "got upset and did not want to hand over the keys [to the Lexus] and used profanities." (*Id.* at 52:16–17; *see also* Garcia Report at 2 ("Mr. Mix was informed to turn over the key fob of the Lexus several times which he refused. He became angered [at] his vehicle being towed and began screaming across the street.").) Mix was ultimately released from the scene "with no further incident" and subsequently received citations for double-parking and unlawful windshield tinting. (Garcia Report at 2; Def. Exs. B, C.)

4. Search of the Lexus

After the Lexus was towed, Garcia drafted the affidavit for the search warrant. (Hearing Tr. at 157:07–24; *see* Def. Ex. A at 3–6.) This was the second search warrant affidavit he had ever written. (Hearing Tr. at 157:25–158:01.) Based on that affidavit, a search warrant was issued the following afternoon by the Honorable Scott T. Rumana, J.S.C. that permitted a search of the "black four-dour Lexus GS . . . registered to Mr. Jo[h]n Mix . . . currently located in the basement vehicle storage area of the Passaic Police Department[.]" (Def. Ex. A at 1–2.)

That day, officers searched the Lexus. ("Garcia Supp. Report," Gov't Ex. 2, at 2.) Because the Lexus's glove box was locked and Mix had refused to hand over his car keys, an officer needed to use a crowbar to wrench it open. (Gov't Ex. 11 at 19:32:30–19:33:43; *see* Hearing Tr. at 199:02–10.) Officers discovered a .40 caliber Glock 23 handgun in the glove box. (Garcia Supp. Report at 2; Gov't Exs. 6–8 (photographs of glove box and handgun).) Officers also recovered a handgun

magazine and thirteen cartridges from the glovebox, as well as a "[c]lear ziplock bag containing marijuana" from the vehicle. (Garcia Supp. Report at 2. ) No narcotics were found. (Hearing Tr. at 200:07–15.)

## B. PROCEDURAL BACKGROUND

On November 7, 2024, Defendant was arrested. (ECF No. 6.) A week later, he was indicted on one count of possession of a firearm and ammunition by a convicted felon under 18 U.S.C. § 922(g)(1). (ECF No. 13.) Following his arraignment (ECF No. 15), Defendant filed the instant Motion.

Defendant seeks: (1) an order dismissing the indictment; (2) an order suppressing all evidence obtained as a result of the purportedly unconstitutional stop and/or as a result of the search warrant based on "false or misleading information;" (3) an order requiring the Government to disclose information regarding the anonymous "citizen informant;" (4) an order requiring the Government's disclosure of *Brady* materials; (5) an order requiring the Government's disclosure of Federal Rule of Evidence 404(b) materials; (6) an order requiring the Government to disclose expert reports and qualifications, as well as summaries of expert testimony; (7) an order requiring the Government's disclosure of Jencks Act material, as well as the "preservation of the rough notes of the law enforcement personnel involved;" (8) an order for a hearing to determine the admissibility of Defendant's prior convictions; and (9) an order granting Defendant "leave to file additional motions as reasonably necessary by the ongoing process of discovery and the defense's investigation into this case." (Mot. Br. at 1, 40.)

On July 15, 2025, as stated, the Court held an evidentiary hearing on the Motion. (Hearing Tr.) The Court heard oral argument from counsel as to Defendant's request to dismiss the indictment (*id.* at 10:14–30:12), and separately conducted an evidentiary hearing as to Defendant's request to suppress all evidence obtained against him (*id.* at 31:21–203:09). During the evidentiary

hearing, the Court heard testimony from three Government witnesses: Cancel, Katz, and Garcia. (*Id.*) Following the hearing, the Court permitted both parties to submit supplemental briefing. On August 1, 2025, the supplemental briefings from both parties were filed. (Gov't Supp. Br.; Def. Supp. Br.)

## II. DISCUSSION

### A. MOTION TO DISMISS THE INDICTMENT

Under Federal Rule of Criminal Procedure ("Rule") 12, a "party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). The following motions *must* be raised before trial: (A) a motion "alleging a defect in instituting the prosecution," (B) a motion alleging "a defect in the indictment or information," (C) a motion for the "suppression of evidence," (D) a motion for the severance of charges/defendants, and (E) a motion for discovery. Fed. R. Crim. P. 12(b)(3). In evaluating a Rule 12 motion to dismiss, "a district court must accept as true the factual allegations set forth in the indictment." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012) (abrogated on other grounds).

Defendant seeks to dismiss the indictment against him by asserting that the statute under which he is charged, 18 U.S.C. § 922(g)(1), is unconstitutional both on its face and as applied to him following *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) and *Range v. Attorney General*, 124 F.4th 218 (3d Cir. 2024) (en banc) ("*Range II*"). (Mot. Br. at 5); *see United States v. Waulk*, No. 20-31, 2024 WL 3937489, at *1 (W.D. Pa. Aug. 26, 2024) (noting argument as to the unconstitutionality of a criminal statute "sounds in Rule 12(b)(3)'s defense of 'a defect in the indictment[,]' including the 'failure to state an offense[.]'" (collecting cases)). Under § 922(g)(1), "[i]t shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . [to] possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been

shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(1). At bottom, Defendant argues § 922(g)(1) infringes upon his Second Amendment right to bear arms.

The oft-litigated issue of the constitutionality of firearm statutes and regulations has produced an ever-developing body of case law. Most significant to the present Motion is the United States Supreme Court's decisions in *Bruen* and *United States v. Rahimi*, 602 U.S. 680 (2024), as well as the Third Circuit's application of this precedent in *Range II*.

1.  Supreme Court Precedent

The Second Amendment to the United States Constitution establishes "the right of the people to keep and bear Arms." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment confers on "all Americans" "the individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 581, 592 (2008). However, the Supreme Court warned that this right is not "unlimited." *See id.* at 595 ("[W]e do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation."). Indeed, *Heller* was not meant "to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . ." *Id.* at 626; *see Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (quoting *Heller*, 554 U.S. at 636)).

More than a decade later, the Supreme Court clarified how to apply *Heller*'s holding, establishing a two-part test for courts to employ when determining the constitutionality of a challenged firearms law: *first*, courts must determine whether "the Second Amendment's plain text covers an individual's conduct" ("*Bruen* Step One"), and *second*, if so, "the [G]overnment must then justify its regulation by demonstrating that it is consistent with the Nation's historical

tradition of firearm regulation" ("*Bruen* Step Two"). *Bruen*, 597 U.S. at 24; *see United States v. Quailes*, 126 F.4th 215, 219 (3d Cir. 2025).

Rahimi later refined *Bruen*'s second step, instructing courts to "ascertain whether the new law [at issue] is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). However, "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster. The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* (internal citations omitted); *see id.* at 691–692 (explaining *Bruen* did not "suggest a law trapped in amber," and the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.").[12]

2.   The Third Circuit's Decision in *Range II*

In 2024, the Third Circuit applied the framework set out by *Heller*, *Bruen*, and *Rahimi* to a challenge to the constitutionality of § 922(g)(1) in *Range II*. 124 F.4th 218. There, Plaintiff Bryan D. Range filed a declaratory action against the Attorney General seeking to have § 922(g)(1) declared unconstitutional as applied to him. *Id.* Range had pled guilty to one count of making a false statement to obtain food stamps in violation of Pennsylvania law in 1995. *Id.* at 222–223. Though classified as a misdemeanor, Range's conviction fell under the ambit of § 922(g)(1) because it was punishable by up to five years' imprisonment. *Id.* at 223; *see* 18 U.S.C. § 922(g)(1).

---

[12] *Rahimi* specifically dealt with the constitutionality of 18 U.S.C. § 922(g)(8), a provision in the same section as § 922(g)(1)—the provision at issue in this case. The Supreme Court held that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Rahimi* 602 U.S. 702; *see id.* at 698 ("[W]e do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse[.]").

Range's other criminal history was "limited to minor traffic and parking infractions and a summary offense for fishing without a license." *Range II*, 124 F.4th at 223.

The Third Circuit began its analysis by answering the "threshold question" of whether Range was one of "the people" who were protected by the Second Amendment. *Id.* at 226. It rejected the Government's contention that "felons are not among 'the people' protected by the Second Amendment," and thus found Range among those protected. *Id.* at 228. Next, the Third Circuit considered the "easy" question at *Bruen* Step One of "whether § 922(g)(1) regulates Second Amendment conduct." *Id.* It found that it did cover Range's conduct: "Range's request— to possess a rifle to hunt and a shotgun to defend himself at home—tracks the constitutional right as defined by *Heller*." *Id.*

Finally, the Third Circuit turned to *Bruen* Step Two to determine "whether the Government has shown that applying § 922(g)(1) to Range would be 'consistent with the Nation's historical tradition of firearm regulation.'" *Id.* The Third Circuit first rejected the Government's reliance on regulations passed in the 20th century. *Id.* at 229 (noting *Rahimi*'s focus on "Founding-era sources" and *Bruen*'s focus on "Founding- and Reconstruction-era sources"). The Third Circuit next rejected the Government's reliance on historical restrictions based on race and religion that would today be unconstitutional and inapposite to Range. *Id.* at 229–230. Finally, the Third Circuit rejected the Government's attempts to stretch the concept of "dangerousness" to cover Range. In doing so, it noted that *Rahimi* "did bless disarming (at least temporarily) physically dangerous people." *Id.* at 230. However, the Government had "no evidence that [Range] pose[d] a physical danger to others or that food-stamp fraud is closely associated with physical danger." *Id.* It refused to adopt a "categorical argument" in which "dangerousness" would "cover all felonies and even misdemeanors that federal law equates with felonies." *Id.*

13

Thus, it found that the Government had not met its burden to show that the "principles underlying the Nation's historical tradition of firearms regulation support depriving Range of his Second Amendment right to possess a firearm," and consequently, held that § 922(g)(1) was unconstitutional as applied to Range. *Id.* at 231. Importantly, the Third Circuit made clear that their decision was a "narrow" one. *Id.* at 232; *see id.* at 235 (Matey, J., concurring) ("[C]ommon sense suggests [that] [w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." (quoting *Rahimi*, 602 U.S. at 698)).

3.  Applying *Bruen* Step One

Here, the parties agree that Defendant is a "person" protected by the Second Amendment, *i.e.*, an American citizen, albeit a felon. (Mot. Br. at 13; Opp. Br. at 10 n.5); *see Range II*, 124 F.4th at 226 (calling this the "threshold question"). However, the parties disagree as to the proper analysis at *Bruen* Step One. According to Defendant, he only needs to show that *§ 922(g)(1)* punishes Second Amendment-protected conduct. (Mot. Br. at 14.) Conversely, according to the Government, Defendant must show that his "*proposed course of conduct*" with respect to firearm possession is protected by the Second Amendment. (Opp. Br. at 10–12.) Here, Defendant has not posited why he was allegedly in possession of a firearm—indeed, Mix hasn't admitted to possession at all.

Although the Government's position appears grounded in *Range II*'s analysis—which explicitly considered at *Bruen* Step One Range's plans "to possess a rifle to hunt and a shotgun to defend himself at home," *Range II*, 124 F.4th at 228—*Range II* was a *civil* case, and "in a criminal context, the issue is not so 'easy.'" *United States v. Williams*, No. 23-690, 2024 WL 1604632, at *5 (D.N.J. Apr. 12, 2024). Notwithstanding, a few courts in this District have followed this aspect of *Range II* even in the criminal context. *See, e.g., United States v. Diaz-Rojas*, No. 22-650, 2025

14

WL 1202013, at *7–9 (D.N.J. Apr. 25, 2025); *United States v. Cadet*, No. 21-630, 2025 WL 101183, at *3 (D.N.J. Jan. 15, 2025).

However, recent Third Circuit precedent closely aligns with Defendant's position. *See, e.g., United States v. Walters*, No. 22-1812, 2025 WL 2536696, at *7 (3d Cir. Sept. 4, 2025) ("[W]e agree that § 922(g)(1), as applied to [defendant], regulates quintessential Second Amendment conduct: possessing a handgun." (internal quotations omitted)); *United States v. Harris*, 144 F.4th 154, 157 (3d Cir. 2025) (same with respect to § 922(g)(3)). This makes sense in the criminal context because "analyzing a defendant's purpose for possession" would lead to a catch-22: in order to explain *why* a defendant was in possession of a firearm, the defendant would first have to admit that they *possessed* the firearm, i.e., an admission of guilt. *Williams*, 2024 WL 1604632, at *5 (quoting *United States v. Harper*, 689 F. Supp. 3d 16, 28 (M.D. Pa. 2023), *rev'd on other grounds, Quailes*, 126 F.4th 215). Hence, for obvious reasons, this framework is problematic, if not unworkable, in the criminal context.

Thus, the Court is persuaded that a determination that § 922(g)(1) regulates "quintessential" Second Amendment conduct is enough to satisfy *Bruen* Step One. *Harris*, 144 F.4th at 157. Notwithstanding, Defendant's constitutional challenge fails because the Government meets its burden at *Bruen* Step Two.

### 4. Applying *Bruen* Step Two

It is the Government's burden at *Bruen* Step Two to show that "applying § 922(g)(1) to [Mix] would be 'consistent with the Nation's historical tradition of firearm regulation.'" *Range II*, 124 F.4th at 228 (citation omitted). Here, the Government has met its burden. The Government argues that this Nation's history supports disarmament of those who have been deemed

"dangerous."[13] (Opp. Br. at 17–24.) The Government cites the Court to a 17th century English statute which "empowered the government to 'seize all arms in the custody or possession of any person' who was 'judge[d] dangerous to the Peace of the Kingdom.'" (*Id.* at 18 (quoting Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13)); *see Cadet*, 2025 WL 101183, at *3 (finding this citation persuasive as part of *Bruen* Step Two analysis)). The Government also cites to colonial and early state laws that disarmed persons who "posed a potential danger to others," like New York and South Carolina laws that disarmed persons convicted of helping those opposing the authority of the Continental Congress. (Opp. Br. at 19 (citing Resolutions of Sept. 1, 1775, *in* 1 Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New-York 132 (1842); Resolution of Mar. 13, 1776, *in* Journal of the Provincial Congress of South Carolina, 1776, at 77 (1776)).) Further, an early Massachusetts law disarmed those "convicted of being notoriously inimical to the cause of American Liberty," and a Connecticut law disarmed those "duly convicted" of seditious libel. (*Id.* (citing Resolution of July 25–26, 1776, *in* 1 American Archives: Fifth Series 588 (Peter Force ed., 1848); Act of Dec. 1775, *in* 15 The Public Records of the Colony of Connecticut From May, 1775 to June 1776, inclusive 193 (Charles J. Hoadly ed., 1890)).)

---

[13] The Government also argues that there is support for disarmament for those who have been convicted of serious crimes. (Opp. Br. at 17.) However, because other courts have found some version of dangerousness to support disarmament, the Court focuses on those arguments for purposes of the Motion. *See, e.g.*, *Pitsilides v. Barr*, 128 F.4th 203, 210 (3d Cir. 2025) ("[W]hile *Rahimi* and *Range II* did not purport to comprehensively define the metes and bounds of justifiable burdens on the Second Amendment right, they do, at a minimum, show that disarmament is justified as long as a felon continues to present a special danger of misusing firearms, in other words, when he would likely pose a physical danger to others if armed." (cleaned up)); *United States v. Savery*, No. 24-551, 2025 WL 1165607, at *9 (D.N.J. Apr. 22, 2025) ("One principle that runs through this Nation's historical tradition of firearm regulation is that the government can disarm dangerous individuals and those who would endanger the public's safety if allowed a firearm.").

Defendant asserts that the Government's arguments regarding "dangerousness" were rejected by the Third Circuit in *Range II* and are contrary to both *Bruen* and *Rahimi*. (Reply Br. at 12–16.) However, the Supreme Court "expressly did not decide the reach of the Second Amendment, whether the government may disarm a person without a judicial finding that he poses a credible threat to another's physical safety, or whether the government may disarm an individual permanently." *Walters*, 2025 WL 2536696, at *8 (internal quotation marks and citations omitted).

Further, although *Range II* cautioned against a "far too broad" reading of dangerousness that would "stretch" to cover all felonies, *Range II*, at 230, decisions post-dating *Range II* have already started to map out the metes and bounds of a narrower construction that does not offend the Second Amendment. *See e.g.*, *Walters*, 2025 WL 2536696, at *8 ("[I]t is not plain that someone convicted of three drug trafficking convictions does not pose a physical danger to others . . . [i]f the Second Amendment's touchstone is dangerousness, then it does not plainly follow that [defendant's] conviction is unconstitutional." (internal quotation marks omitted)); *United States v. White*, No. 23-3013, 2025 WL 384112, at *2 (3d Cir. Feb. 4, 2025) (non-precedential) ("[Defendant's] Second Amendment challenge to § 922(g)(1) fails because his prior felony convictions . . . demonstrate he presents a special danger of misusing firearms, and would likely pose an increased risk of physical danger to others if armed[.]" (cleaned up)), *cert. denied*, No. 24-7158, 2025 WL 1679042 (U.S. June 16, 2025); *Diaz-Rojas*, 2025 WL 1202013, at *9 ("The Court notes the robust precedent previously cited recognizing the nexus between drug trafficking and illegal gun violence, which acknowledge the longstanding tradition of legislatures disarming individuals who pose a danger to themselves or others."); *United States v. Trusty*, No. 20-543, 2025 WL 830124, at *4 (D.N.J. Mar. 17, 2025) ("[Defendant] can be constitutionally disarmed, as

the Third Circuit has held, because his prior convictions pose a danger to the physical safety of others.").

Indeed, "[c]ourts adjudicating as-applied challenges to § 922(g)(1) must consider a convict's entire criminal history and post-conviction conduct indicative of dangerousness, along with his predicate offense and the conduct giving rise to that conviction, to evaluate whether he meets the threshold for continued disarmament." *Pitsilides v. Barr*, 128 F.4th 203, 212 (3d Cir. 2025); *Walters*, 2025 WL 2536696, at *8 ("Based on our precedent, we evaluate the individual's criminal history before deciding whether § 922(g)(1) has been unconstitutionally applied.").

Here, the parties jointly provided the Court with a list of Mix's criminal convictions. Focusing only on his adult convictions which date back to October 2005—almost 20 years before the instant offense occurred—in multiple states,[14] the list includes 16 criminal convictions, six of which are felonies.[15] The felonies include offenses both before and after the subject charge at bar and include: (i) two convictions for possession of a controlled dangerous substance in 2007 and 2008 (ii) one conviction for causing death while driving while either suspended or unlicensed in 2014; (iii) one conviction for possession with intent to distribute a controlled dangerous substance and possession with intent to distribute a controlled dangerous substance within 1,000 feet of school property in 2016 (the predicate felony); (iv) one conviction for possession of a controlled

---

[14] "Although the court's review generally is confined to the facts alleged in the indictment . . . the Third Circuit Court of Appeals has instructed that certain facts are critical when considering an as-applied challenge to § 922(g)(1) in the criminal context, including 'the predicate offenses that made [the defendant] a felon' and 'the circumstances of a criminal offense . . . regardless of whether they were charged.'" *United States v. Hoffman*, No. 17-80, 2025 WL 2581936, at *1 (D.N.J. Sept. 5, 2025) (quoting *United States v. Moore*, 111 F.4th 266, 272, 273 (3d Cir. 2024)).

[15] In addition, Defendant was previously adjudicated as an adult for the misdemeanor crimes of simple assault in 2006 and resisting arrest twice in 2006 and 2012.

substance with intent to distribute in 2019; and (v) one conviction for two counts of receiving stolen property in 2024.[16]

Many courts in both the Third Circuit and beyond have "recognized this Nation's historical tradition of disarming dangerous individuals and those who would threaten the public's safety if armed."[17] *United States v. Savery*, No. 24-551, 2025 WL 1165607, at *10 (D.N.J. Apr. 22, 2025) (collecting cases). For example, the Third Circuit has specifically opined that "drug trafficking may be the kind of conviction justifying disarmament because dealing drugs runs the risk of violence." *Walters*, 2025 WL 2536696, at *8 (collecting cases).

Mix's predicate felony alone—possession with intent to distribute a controlled dangerous substance and possession with intent to distribute a controlled dangerous substance within 1,000 feet of a school zone—bespeaks dangerousness. Undoubtedly, trafficking drugs in close vicinity to minors makes Mix "the type of person who could be deemed a threat to the public order and peace who historically could have been disarmed as such." *United States v. Newkirk*, No. 20-00623, 2024 WL 3518109, at *8 (D.N.J. July 23, 2024); *see, e.g.*, *Trusty*, 2025 WL 830124, at *5 (rejecting as-applied challenge to § 922(g)(1) where a defendant had "four prior felony convictions for drug offenses, including a conviction for manufacturing, distributing, or possessing heroin with an intent to distribute, and another for drug possession within 1,000 feet of a school zone"); *United States v. Boone*, No. 22-233, 2024 WL 965146, at *8 (D.N.J. Mar. 6, 2024) (holding § 922(g)(1) constitutional as applied to defendant with "multiple prior drug trafficking felonies, two of which

---

[16] At the July 15, 2025 hearing, there was also reference to a receipt of stolen property conviction in Passaic County in 2013. (Hearing Tr. at 23:13–16.) Confusingly, this conviction does not appear on the list provided to the Court subsequent to the hearing. However, because it is not determinative to the Court's conclusions, it will not be addressed further, and the Court will not consider it in its analysis herein.

[17] Relatedly, while the *Range II* court rejected attempts to analogize Range to groups such as Loyalists because there was no "evidence that Range posed a physical danger to others," the same cannot be said of Mix. *United States v. Handlovic*, No. 24-207, 2025 WL 1085172, at *11 (M.D. Pa. Apr. 10, 2025).

occurred on or near school property"); *Newkirk*, 2024 WL 3518109, at *8 (rejecting as-applied challenge to § 922(g)(1) where defendant had "previously been convicted of drug distribution on or within 1,000 feet of school property").

As illustrated above, courts across this District have rejected as-applied challenges to § 922(g)(1) where defendants have had prior felony convictions similar to those in Mix's record. *See also Savery*, 2025 WL 1165607, at *10 (rejecting as-applied challenge to § 922(g)(1) where defendant's "multiple drug-trafficking convictions—alone—shows that he is dangerous and likely to pose a physical danger to others if armed." (cleaned up)); *United States v. Taylor*, No. 23-477, 2025 WL 2017122, at *16 (D.N.J. July 18, 2025) (concluding defendant's "drug-trafficking convictions alone are enough to disarm him" under § 922(g)(1)).

Other circuits have held similarly. For example, the Sixth Circuit has opined that "[a] person convicted of a crime is 'dangerous,' and can thus be disarmed, if he has committed (1) a crime 'against the body of another human being,' including (but not limited to) murder, rape, assault, and robbery, or (2) a crime that inherently poses a significant threat of danger, including (but not limited to) drug trafficking and burglary." *United States v. Williams*, 113 F.4th 637, 663 (6th Cir. 2024); *see also United States v. Peck*, 131 F.4th 629, 632 (8th Cir. 2025), *reh'g denied*, No. 24-1198, 2025 WL 1454974 (8th Cir. May 21, 2025) (rejecting as-applied challenge to § 922(g)(1) in which defendant had a prior nonviolent drug offense); *United States v. Kimble*, 142 F.4th 308, 312 (5th Cir. 2025) ("We . . . hold that [§ 922](g)(1) is constitutional as applied to defendants with predicate felonies for drug-trafficking offenses because of the intrinsic violence of the drug trade.").

Neither Defendant nor this Court has located any authority holding § 922(g)(1) unconstitutional as applied to a criminal defendant with Mix's significant criminal history. (*See*

Hearing Tr. at 26:19–24.) Mix's felony convictions, and particularly his two possession-with-intent-to-distribute convictions (which included the predicate offense for possession with intent to distribute within 1,000 feet of school property) undoubtedly bespeak the potential for violence. *See White*, 2025 WL 384112, at *2 ("[Defendant's] criminal history, including his prior felony convictions for possession with intent to distribute controlled substances . . . shows that he would pose such a danger to others if armed because those activities could lead to violent confrontation.").

Because "[t]he natural right to self-defense, like all other natural rights, can be exercised only by a virtuous people [] that respect social order, legitimate authority, and civic virtue," there is a "reason for restrictions of the right to bear arms on those who set themselves against civil society by individual actions inconsistent with the common good." *Range II*, 124 F.4th at 235 (Matey, J., concurring) (internal quotation marks and citations omitted). The Government has met its burden to show that disarmament of felons like Mix who have committed drug crimes that could be deemed dangerous is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Thus, 18 U.S.C. § 922(g)(1) is constitutional as applied to Defendant.

5. Facial Challenge

Where a defendant fails to show that a statute is unconstitutional as applied, their facial challenge—which is the "most difficult challenge to mount successfully"—necessarily fails. *See Rahimi*, 602 U.S. at 693 (noting a facial challenge requires a defendant to "establish that no set of circumstances exists under which [the statute] would be valid" and "the Government need only demonstrate that [the statute] is constitutional in some of its applications" (internal citations omitted)); (*see* Hearing Tr. at 10:14–20 (conceding the Court "need not go forward with the facial application" if the Court finds the "as-applied argument fails").) "Because the statute is constitutional as applied to [Mix], he has not shown that 'there is no set of circumstances' under which the statute may be applied constitutionally." *United States v. Mitchell*, 652 F.3d 387, 415

(3d Cir. 2011); *see United States v. Goodnight*, No. 23-1882, 2025 WL 1276000, at *2 (3d Cir. May 2, 2025) (non-precedential) ("[Defendant] cannot establish that it is plain under existing caselaw that there is 'no set of circumstances' under which § 922(g)(1) would be valid.").

Thus, because Defendant's constitutional challenge fails *in toto*, the Motion is **DENIED** insofar as it seeks dismissal of Defendant's indictment.

### B. MOTION TO SUPPRESS ALL EVIDENCE OBTAINED AS A RESULT OF THE UNCONSTITUTIONAL STOP, SEARCH, AND PURPORTEDLY TAINTED WARRANT

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, . . . and [provides that] no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This "generally requires that search warrants be supported by probable cause." *United States v. Vosburgh*, 602 F.3d 512, 525 (3d Cir. 2010). Thus, a seizure is typically reasonable under the Fourth Amendment where it is "effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002); *Almeida-Sanchez v. United States*, 413 U.S. 266, 269 (1973) ("Automobile or no automobile, there must be probable cause for the search."). Any evidence obtained incident to an unconstitutional seizure, however, "must be suppressed as 'fruit of the poisonous tree.'" *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (quoting *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006)); *see Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963).

A defendant who seeks suppression of evidence under the Fourth Amendment bears the burden of proof. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). However, once a basis for the motion is established, the burden shifts to the Government to show that the search or seizure was reasonable. *Id.* "[T]he Government must establish by a preponderance of the evidence that

any action taken by its agents fall within the bounds of the Constitution." *United States v. Leake*, No. 07-655, 2009 WL 482372, at *2 (D.N.J. Feb. 25, 2009), *aff'd*, 396 F. App'x 898 (3d Cir. 2010).

Here, the chain of events leading up to the recovery of the handgun and ammunition read straight out of a law school exam: there is an anonymous tip, a pretextual traffic stop, an extension of the stop to call in a narcotics K-9, and a positive alert by the K-9, and even a search warrant. To be sure, Defendant contests essentially every aspect of this stop and subsequent search, including (i) the bases for reasonable suspicion as to both the initial stop and the call for K-9 Koen; and (ii) the bases for probable cause to subsequently search the Lexus and recover the handgun and ammunition at-issue. After evaluating the credibility of the testifying witnesses at the evidentiary hearing, the Court assesses the constitutionality of each step of the traffic stop and subsequent search of Mix's Lexus *ad seriatim*, starting with the bases for reasonable suspicion, followed by the subsequent bases for probable cause.

1. Credibility Determinations

On a motion to suppress, a district court "has a responsibility to determine the credibility of witnesses at an evidentiary hearing[.]" *United States v. Childs*, No. 22-30, 2025 WL 2476426, at *4 (D.N.J. Aug. 27, 2025) (citing *United States v. Harris*, No. 20-679, 2023 WL 5425395, at *4 (D.N.J. Aug. 23, 2023)); *United States v. Howard*, 787 F. Supp. 2d 330, 332 (D.N.J. 2011) ("As the finder of fact, the court can accept or reject any or all of a witness's testimony."). A district court considers a number of factors when evaluating a witness's credibility: "the witness's demeanor and manner on the stand; the witness's ability to accurately recollect the matters at hand; and the extent to which the testimony withstands a common-sense test of reason and logic." *Harris*, 2023 WL 5425395, at *4 (citing *Howard*, 787 F. Supp. 2d at 332)).

Having observed each of Cancel's,[18] Garcia's,[19] and Katz's[20] demeanor, manner, and testimony, each witness appeared calm and confident as he testified. While there may have been some details that each officer could not recall about an event that happened nearly two years prior, "[t]he fact that a witness may not have a perfect recall about an event is no reason to exclude his testimony." *United States v. Lena*, 497 F. Supp. 1352, 1362 (W.D. Pa. 1980), *aff'd,* 649 F.2d 861 (3d Cir. 1981). The officers' testimony also generally aligned with both their written reports and the provided BWC footage. *Taylor*, 2025 WL 2017122, at *6 ("The officers' body camera footage, which the Court received into evidence, aligns with their testimony."). While Katz's testimony ultimately went unimpeached, both Cancel and Garcia openly acknowledged and admitted to any misstatements or omissions in their police reports, their statements on scene, or within the search warrant affidavit without any evasiveness or defensiveness, which only bolstered the Court's view

---

[18] As to Cancel's credentials, Cancel testified that he has worked for the Passaic Police Department since graduating from the Passaic Police Academy in July 2013. (Hearing Tr. at 32:13–24.) He described his training in "various aspects of law enforcement," including attending yearly continuing-education classes. (*Id.* at 32:20–33:02 (noting training in "specific areas like 2C, Criminal Code; Title 39; and New Jersey AG guidelines").) He stated that he has conducted "thousands" of motor vehicle stops, "hundreds" of which have been for suspicion of narcotics activity. (*Id.* at 33:04–10.)

[19] As to Garcia's credentials, Garcia testified that he has worked for the Passaic Police Department since September 2018 following six months of police academy training. (Hearing Tr. at 146:23–147:09.) While employed with the Passaic Police Department, Garcia stated he worked in both the Patrol Division and the Gang Intelligence Unit. (*Id.* at 146:18–147:05.) He testified to having conducted "500 to even a thousand" motor vehicle stops during his law enforcement career, "hundreds" of which were related to suspicion of narcotics. (*Id.* at 147:11–147:17.)

[20] As to Katz's credentials, Katz testified that he has been employed by the Passaic County Sheriff's Office for approximately seventeen years. (Hearing Tr. at 97:08–15.) He is assigned to the K-9 and Patrolling Divisions, wherein he assists municipal police departments "with locating suspects, narcotics searches, regular patrol duties, evidence searches, and area searches." (*Id.* at 97:20–23.) With respect to Katz's K-9, a Belgian Malinois named Koen, Katz testified that he and Koen had responded to approximately twenty calls a year for five years at the time of the stop of Mix. (*Id.* at 107:13–108:11.) As discussed in more detail hereinbelow, Katz also testified extensively regarding both his own training and his trainings with Koen. (*Id.* at 98:19–104:4; 108:19–119:2.)

of their candor.[21] (*See* Hearing Tr. at 38:02–07, 60:08–14, 66:13–19, 68:25–69:02, 71:02–08, 71:23–72:01, 75:21–77:04, 78:12–79:04, 161:12–14, 162:01–03 (Garcia confirming he was not trying to "mislead" anyone with misstatements).)

The Court finds all three witnesses were longstanding, highly-experienced law enforcement officers. Each displayed an even-keeled, professional demeanor on both direct and cross-examination. None of the officers exhibited defensiveness during questioning, and none exhibited any animus against Defendant. In conclusion, the Court finds Cancel, Garcia, and Katz testified forthrightly and earnestly, and thus accords their testimony a high-degree of reliability.

2.   Bases for Reasonable Suspicion

Turning to the constitutionality of Mix's stop, the search of the Lexus, and the seizure of a handgun and ammunition from the vehicle, the Court starts its analysis by examining whether there was reasonable suspicion to support both the impetus for the initial stop and the prolonging of the stop for a K-9 investigation. After this analysis, the Court turns to assessing the bases for probable cause to search the Lexus, namely the positive K-9 alert and/or the lawfully-issued search warrant.

"A traffic stop is a 'seizure' within the meaning of the Fourth Amendment[.]" *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006). However, "[a] well-established exception to the Fourth Amendment's warrant requirement permits an officer to 'conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Campbell*, No. 18-354, 2019 WL 979163, at *2 (D.N.J. Feb. 28, 2019) (quoting *Illinois*

---

[21] As examples: (i) the search warrant affidavit stated that E.W. was released on a summons, but E.W. actually only received a summons *after* he was released (Hearing Tr. at 68:16–69:02); (ii) Cancel erroneously told the county prosecutor that E.W. admitted that he was buying drugs (*id.* at 75:21–25); and (iii) Garcia erroneously stated in the warrant affidavit that the "citizen" informant was a "confidential" informant (*id.* at 195:06–08). With respect to any misstatements made while on-scene, Cancel reasonably explained that "[t]here was a lot of stuff going on" at once. (*Id.* at 79:01–05.) The Court finds that none of these misstatements, either individually or in the aggregate, alter in any material way the existence of, or the Superior Court's finding of, probable cause.

*v. Wardlow*, 528 U.S. 119, 123 (2000)), *aff'd sub nom. United States v. Yusuf*, 993 F.3d 167 (3d Cir. 2021)). Reasonable suspicion is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000) (quoting *Wardlow*, 528 U.S. at 123).

In evaluating reasonable suspicion, the Court must consider "the totality of the circumstances—the whole picture." *United States v. Sokolow*, 490 U.S. 1, 8 (1989) (citation omitted). In assessing the totality of the circumstances, a court must "recognize the particular ability of law enforcement officers, based on training and experience, 'to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Green*, 897 F.3d 173, 183 (3d Cir. 2018) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Further, "even if a criminal defendant provides a plausible, innocent explanation for each arguably suspicious factor on its own, that does not defeat the inference of reasonable suspicion derived from the cumulative effect of available information." *United States v. Stewart*, 92 F.4th 461, 468 (3d Cir. 2024) (noting that "reasonable suspicion cannot be defeated by a so-called 'divide-and-conquer' analysis" (citation omitted)).

Ultimately, the Court must consider "whether a reasonable, trained officer standing in [the officer's] shoes could articulate specific reasons justifying [the] detention." *United States v. McCants*, 952 F.3d 416, 422 (3d Cir. 2020) (quoting *Brown*, 448 F.3d at 246–47); *id.* (noting that "[s]uch reasonable suspicion requires 'at least a minimal level of objective justification for making the stop' and more than an 'inchoate and unparticularized suspicion or 'hunch'' of criminal activity." (quoting *Wardlow*, 528 U.S. at 123).

  i.   *Initial Stop*

While Defendant contests the grounds for his initial stop in his briefing (*see* Mot. Br. at 22–24; Reply Br. at 19), there is no doubt that at least one traffic infraction formed the basis of

reasonable suspicion to initially stop Mix's Lexus. *See Delfin-Colina*, 464 F.3d at 397 ("[T]he *Terry* reasonable suspicion standard applies to routine traffic stops."); *United States v. Richardson*, No. 15-0176, 2016 WL 223705, at *3 (D.N.J. Jan. 19, 2016) ("[T]he Supreme Court has held that in order to conduct a traffic stop, an officer must have a reasonable, articulable suspicion that a violation of the law has occurred." (citing *Delaware v. Prouse*, 440 U.S. 648, 663 (1979)). Both Cancel and Garcia testified to observing the Lexus to be double-parked (Hearing Tr. at 44:21–45:03, 150:25–151:01), this observation is documented in both of their police reports (Cancel Report at 2; Garcia Report at 2), and BWC footage clearly shows the Lexus parked in the middle of the street (Garcia BWC at 19:11:39). While Defendant repeatedly attacked the validity of the officers' observations of illegal window tinting (*see, e.g.*, Hearing Tr. at 179:21–180:10), the officers' observations of double-parking went unrebutted at the evidentiary hearing.

A traffic stop is lawful "if officers have a reasonable suspicion that the stoppee has violated a traffic law." *United States v. Jones*, 506 F. App'x 128, 131 (3d Cir. 2012). As Cancel testified, double-parking is a violation of the New Jersey Motor Vehicle Code. (Hearing Tr. at 44:21–45:03; *see* N.J.S.A. 39:4-138(m); Def. Ex. B.) Other courts have found double-parking to serve as a basis for reasonable suspicion. *See, e.g., United States v. Felder*, No. 19-343, 2021 WL 2024970, at *3 (D.N.J. May 21, 2021) ("[Officer] had a reasonable basis to stop [defendant] because the [v]ehicle was parked illegally."); *United States v. Coleman*, 603 F.3d 496, 499 (8th Cir. 2010) ("[W]e agree with the district court that the stop was lawful because of the officer's observation of a traffic violation for double parking.").

Notably, the Government also posits that the tip from the anonymous citizen informant can serve as a basis for reasonable suspicion. (Opp. Br. at 29.) However, the Court does not find the anonymous citizen informant's tip to have been sufficiently reliable to establish reasonable

suspicion, much less probable cause. "When a *Terry* stop is based on a tip provided by an informant, [the Court] must scrutinize the informant's 'veracity, reliability, and basis of knowledge' to determine whether the information relied upon by the police was sufficient to establish reasonable suspicion for the stop." *United States v. Johnson*, 592 F.3d 442, 449 (3d Cir. 2010). Factors informing the analysis include:

> (1) the information was provided to the police in a face-to-face interaction, allowing an officer to assess directly the informant's credibility;
>
> (2) the informant can be held responsible if her allegations are untrue;
>
> (3) the information would not be available to the ordinary observer;
>
> (4) the informant has recently witnessed the criminal activity at issue; and
>
> (5) the witness's information accurately predicts future activity.

*Id.* "[W]here there is no basis for determining the reliability of a tip from the informant, the information contained in the tip cannot by itself be sufficient to provide probable cause or even reasonable suspicion to justify a *Terry* stop." *United States v. Nelson*, 284 F.3d 472, 479–80 (3d Cir. 2002) (citing *Alabama v. White,* 496 U.S. 325, 329 (1990)).

Cancel's police report contains a single paragraph regarding the anonymous tip in this case:

> While on duty on 08/02/2023, I received information that a narcotics transaction was going to take place in the area of Third Street and South Street, Passaic, NJ. The information provided stated that a white male inside of a silver in color Chrysler convertible bearing NJ registration Y97KRS was going to purchase narcotics from a black male who resides in the area. The citizen informant who wishes to remain anonymous stated that he observed the male inside of the Chrysler convertible purchase narcotics from the area of Third Street and South Street, Passaic, NJ on 08/01/2023 from a black male who resides in the area. The citizen informant advised that he observed the black male operating a black in color Lexus bearing NJ license plates fully tinted out. The citizen informant further provided that the Chrysler convertible and Lexus were now on Fifth Street and South Street, Passaic, NJ and that the narcotics transaction was going to occur.

(Cancel Report at 2.)

During his testimony, Cancel clarified that the information he received was via a call "from a long-time resident from the area who [he] kn[e]w through softball." (Hearing Tr. at 37:02–06.) Significantly, the informant (i) was not employed by the Passaic Police Department, (ii) was not paid for the information he reported, (iii) was not given anything in exchange for providing information, and (iv) did not have any pending criminal exposure on any other matter. (*Id.* at 37:07–19.)

To be sure, this is not a case in which the person providing the tip was truly anonymous to officers; here, Cancel knew the informant through local sports. *See Nelson*, 284 F.3d at 482 (noting the informant "was not truly anonymous" where he could be identified by officers which "increased the reliability of the caller"). Still, even assuming the informant had "recently witnessed the criminal activity at issue," there are insufficient facts provided to allow the Court to conclude that the information "would not be available to the ordinary observer" or that the informant was "accurately predict[ing] *future* activity." *Johnson*, 592 F.3d at 449. Essentially, the informant merely reported that he had observed two vehicles, driven by a Black man and white man respectively, on a public street engaged in a purported drug deal the day prior, and that those same vehicles and drivers were presently on a public street yet again about to engage in another deal. The informant did not advise (i) *how* he knew a drug transaction was going to take place, (ii) *why* he thought a drug transaction was going to take place again; and (iii) how he knew it was *illegal drugs* that he had purportedly seen being purchased the day prior.[22] (Hearing Tr. at 59:07–63:23.)

---

[22] For the first time during the evidentiary hearing, Cancel mentioned that the informant stated he had observed "a transaction of money for an item," but Cancel did not ask the informant what the "item" was. (Hearing Tr. at 60:08–14.) This information is not contained in Cancel's police report, was not reported to anyone on scene, and is not in the search warrant affidavit. (*Id.* at 62:08–20.) Even though the Court finds Cancel to be credible, it will not consider this piece of information for purposes of deciding this Motion.

Indeed, in *United States v. Roberson*, the Third Circuit found inadequate an "anonymous and bare-bones tip" from a caller who "described a person, his attire, and his location and reported that he was selling drugs." *Nelson*, 284 F.3d at 481 (citing *United States v. Roberson*, 90 F.3d 75, 79–80 (3d Cir. 1996)). While the officers found a person who matched the description in the location reported, the Third Circuit concluded that "[a]n individual's presence in a residential neighborhood, even at a 'hot corner' known for drug sales, could not, of itself, give rise to a reasonable suspicion justifying the investigative stop of [Defendant]." *Id.*

With respect to reporting "future" activity, even assuming that reporting where the vehicles were *currently* parked—as the informant here appears to have done—could be considered reporting "future" activity, "[k]nowledge about a person's future movements indicates some familiarity with that person's affairs, but having such knowledge does not necessarily imply that the informant knows, in particular, whether that person is carrying hidden contraband." *Florida v. J.L.*, 529 U.S. 266, 271 (2000). To be sure, the informant was initially *incorrect* as to where the second purported drug deal was going to take place. The vehicles were not on Third Street as the informant initially reported, and instead, the informant called Cancel a second time to say the vehicles were on Fifth Street—an innocuous observation anyone could have made. *See Nelson*, 284 F.3d at 484 ("[W]hat distinguished particularized facts that do support a reasonable suspicion from generalized facts that do not, is whether 'anyone' could have provided the information on which the police relied, and whether the details were known 'to the general public.'") While Cancel rationalized that the tipster's "[d]escription matched the vehicles and the operators," (Hearing Tr. at 91:02–15), "[a] tip is not reliable merely because its description of the suspect's visible attributes prove accurate." *Brown*, 448 F.3d at 250 (internal quotation marks omitted)).

The lack of reliability of the tip is further bolstered by the lack of corroboration undertaken at the scene. Cancel did not observe: (i) a hand-to-hand transaction, (ii) the exchange of money, (iii) Mix and E.W. interacting, or (iv) the presence of narcotics in either the Chrysler or the Lexus. (Hearing Tr. at 63:24–64:09; *see id.* at 176:09–14 (Garcia confirming he, too, did not see Mix interact with anyone prior to the stop, including in any hand-to-hand street transaction; *id.* at 184:04–16 (Garcia confirming he also did not see any indicia of drug dealing in Mix's vehicle, including rolled-up bills of money, a scale, or narcotics).) Additionally, in his limited interaction with E.W., Cancel did not ask any questions to confirm the reliability of the tip: (i) he did not ask whether E.W. was there the day before, (ii) he did not ask whether E.W. had bought drugs from Mix, (iii) he did not ask whether E.W. was meeting the driver of the Lexus, and (iv) E.W. did not explicitly confirm, in response to Cancel, that he was in the area to purchase drugs. (*Id.* at 74:19–75:04.) Indeed, Cancel acknowledged that E.W. "did not provide [him] any information to corroborate the tipster's information[.]" (*Id.* at 75:05–07.)

Ultimately, Cancel himself acknowledged that he did not observe any behavior consistent with a drug deal between Mix and E.W., and neither Mix nor E.W. ever provided any information to corroborate the anonymous tip. Thus, the Court does not find the tip to have been sufficiently reliable to form the basis of reasonable suspicion or probable cause in this case.[23]

Because Mix committed a traffic violation by double-parking, there was clear and irrefutable reasonable suspicion to support conducting a traffic stop. *United States v. Johnson*, 434 F. App'x 159, 162 (3d Cir. 2011) (discussing the "bright-line rule that any technical violation of a traffic code legitimizes a stop[.]")).

---

[23] To state the obvious, even if the Court *were* to find that the tip could form the basis of reasonable suspicion and/or probable cause, it would only bolster the Court's conclusion that the stop and search of Mix and his vehicle were lawful.

ii.    *Calling in K-9 Koen*

"An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, *so long as those inquiries do not measurably extend the duration of the stop*." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (emphasis added). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."). Importantly, "a dog sniff is not fairly characterized as part of the officer's traffic mission." *Id.* at 356. Rather, after what is referred to as the "*Rodriguez* moment," (i.e., the moment the mission of the traffic stop is complete), "officers must have [independent] reasonable suspicion to prolong the stop for a canine sniff. Anything that occurs after officers begin to prolong the stop cannot be considered in the reasonable suspicion analysis." *United States v. Hunter*, No. 19-3735, 2022 WL 1011225, at *3 (3d Cir. Apr. 5, 2022) (non-precedential) (noting the *Rodriguez* moment "is often difficult to identify in practice").

While Defendant argues to the contrary—that there was no reasonable suspicion to support extending Mix's traffic stop to have a K-9 investigate the scene—the Government cites a number of factors that supported reasonable suspicion to extend the stop.[24] (Mot. Br. at 24–26; Reply Br. at 22–24; Def. Supp. Br. at 6–8; Gov't Supp. Br. at 7.)

At the outset, the length of time that the stop was prolonged—25 to 30 minutes—does not in and of itself give rise to a constitutional violation. The Third Circuit has permitted delays of up to 80 minutes in order to wait for a K-9 unit to arrive. *See, e.g.*, *United States v. Leal*, 235 F. App'x

---

[24] To be sure, Garcia confirmed that officers did not learn of any active warrants or any issues with Mix's license during the stop. (Hearing Tr. at 183:09–14.)

937, 942 (3d Cir. 2007) (finding 80 minute delay in K-9 unit arriving "may have bumped up against the outer limit of a *Terry* stop but did not cross it," where officers had reasonable suspicion and acted diligently); *United States v. Johnson*, 434 F. App'x 159, 163 (3d Cir. 2011) (finding that 45–50 minute "delay caused by the wait for the canine unit did not offend the Fourth Amendment, particularly since there was no evidence that the trooper was not diligent in pursuing this means of investigation."). Here, Cancel diligently put out a request for a K-9 unit within approximately 2 minutes of conferring with Garcia and speaking with Mix. (*See* Cancel BWC at 19:15:04–19:17:22.) Thus, here, the length of the wait for the K-9 does not violate the Fourth Amendment.

Next, the Court must determine whether the traffic stop was "measurably extend[ed]." *Johnson*, 555 U.S. at 333. This *"Rodriguez* rule" is "far easier to articulate than to apply." *Green*, 897 F.3d at 179. The entirety of Mix's stop lasted approximately one hour. (*See* Garcia BWC.) Defendant argues that Mix's stop "should have been over when the officers ran the credentials of the driver, determined they were in order, and had the necessary information to issue the traffic summonses." (Mot. Br. at 25.) He represents this occurred "10 minutes into the stop." (Def. Supp. Br. at 7.) Separately, Defendant appears to take issue with the fact that performing tasks related to Mix's traffic infractions lasted approximately 10 minutes but lasted "less than three minutes" with E.W.[25] (*Id.*) For its part, the Government does not appear to propose its own *"Rodriguez* moment" but rather argues that reasonable suspicion of criminal activity arose within the very first few moments of the traffic stop. (Gov't Supp. Br. at 7.)

---

[25] Cancel explained exactly why he concluded the stop of E.W. so quickly. (Hearing Tr. at 40:19–41:3, 42:07–12.) He could overhear Garcia and Zapata's stop of Mix growing increasingly "loud," and as the highest-ranking officer on-scene, Cancel felt it was his duty to ensure the safety of both Mix and his fellow officers by attending to that scene, which appeared more pressing than his stop of E.W., who "didn't pose a threat or a problem." (*Id.*)

Like many fast-evolving, dynamic law enforcement interactions with members of the public, the evidentiary record is not precisely clear as to when the traffic stop of Mix ceased and further investigation into criminal activity began. Given the lack of a clear *Rodriguez* moment under these circumstances, the Court adopts Defendant's position that the *Rodriguez* moment occurred when officers handed Mix's license back to him 10 minutes into the stop. (Def. Supp. Br. at 7); *see United States v. Trusty*, No. 20-543, 2024 WL 1827645, at *12 n.11 (D.N.J. Apr. 26, 2024) (noting that "in appropriate cases, district courts might sidestep the difficult task of pinpointing the actual *Rodriguez* moment by simply assuming the defendant's proposed earliest potential *Rodriguez* moment." (citations omitted)).

Assuming *arguendo* that the "*Rodriguez* moment" should have occurred approximately three minutes into the stop (i.e., the length of time E.W.'s stop lasted), there were numerous factors contributing to reasonable suspicion that arose very early on in Mix's stop. *Green*, 897 F.3d at 179 ("After determining when the stop was extended . . . we can assess whether the facts available . . . at that time were sufficient to establish reasonable suspicion that [defendant] was involved in drug trafficking."); *see United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020) ("We hold [officer] had reasonable suspicion to extend the stop based on information he obtained during the first few minutes of the traffic stop and before he engaged in any unrelated investigation.").

***High-Crime Area***. Even before Garcia exited his police vehicle, he was familiar with the area in which the Lexus was stopped. Garcia testified that he routinely patrolled the area because it is "a high drug trafficking area, high in crime as well." (Hearing Tr. at 150:11–14; Garcia Report at 2 (stating the area in which he observed the Lexus was "known[] to be a high narcotic trafficking area"); *see* Hearing Tr. at 45:25–46:07 (Cancel testifying that the area where the stop occurred was "high in criminal activity, specifically drug activity").) "The presence of a suspect in a 'high crime

34

area,' i.e., an 'area of expected criminal activity' is a factor that courts can consider when determining whether police had reasonable suspicion . . ." *United States v. Travis*, No. 24-265, 2024 WL 5117562, at \*12 n.7 (D.N.J. Dec. 16, 2024) (quoting *Wardlow*, 528 U.S. at 124); *see United States v. Fogle*, 515 F. Supp. 2d 474, 484 (D.N.J. 2007) (noting courts may consider "the reputation of the area in which the stop occurred for criminal activity"). While this factor, standing alone, "is not enough to support a reasonable, particularized suspicion that the person is committing a crime," "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 124.

***Furtive Movements.*** As Defendant concedes, furtive movements are "often considered a factor in determining reasonable suspicion." (Reply Br. at 24 (noting, however, that such movements have to be "viewed in the totality of the circumstances.").) Garcia reported that as soon as he exited his police vehicle and walked towards Mix's Lexus, he observed Mix "ma[k]e several furtive movements reaching towards the front passenger seat compartment in a manner consistent with attempting to conceal contraband or a weapon." (Garcia Report at 2.) He testified that as he exited his police vehicle, he observed Mix "reaching over the center console into the area of the glove box." (Hearing Tr. at 153:12–16.) He believed Mix to be "possibly reach[ing] for a weapon or [to] conceal a weapon or contraband." (*Id.* at 154:08–10.) These movements lasted "seconds" from the time it took Garcia to walk and "reach[] the A-pillar of the vehicle." (*Id.* at 181:23–182:02.)

Defendant repeatedly argues that there is likely an innocent explanation for Mix's movements—attempting to obtain his wallet for the officers—and that the officers' subsequent

sweep of the Lexus should have dispelled any concerns as to hidden contraband.[26] (*See* Mot. Br. at 26; Reply Br. at 24; Def. Supp. Br. at 7–8.) Undoubtedly, there *could* have been an innocent explanation for Mix's movements, but "[a] trained officer may find reasonable suspicion 'based on acts capable of innocent explanation.'" *United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018) (quoting *United States v. Graves*, 877 F.3d 494, 499 (3d Cir. 2017)); *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000), *as amended* (Sept. 28, 2000) ("A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity."). Even so, Garcia reported that he observed Mix removing his wallet "from his rear pant pocket"—not the glove box towards which he saw Mix reaching—making Mix's supposed innocent explanation for his movements more dubious. (Garcia Report at 2.)

Further, Garcia and Cancel's sweep would not have revealed any contraband concealed in either a "hidden compartment" or the glove box toward which Garcia saw Mix reach. (Hearing Tr. at 80:07–23, 153:12–16.) Ultimately, "[a] suspect's furtive movements can contribute to an officer's reasonable suspicion that criminal activity is afoot." *United States v. Velazquez*, No. 23-657, 2024 WL 49690, at *6 (D.N.J. Jan. 4, 2024) (quoting *United States v. Harrison*, 2018 WL 4405892, at *8 (E.D. Pa. Sept. 17, 2018) (collecting cases)), *reconsideration denied*, No. 23-657, 2024 WL 1767570 (D.N.J. Apr. 23, 2024). Thus, Garcia's "credible testimony that [Mix] moved in a manner suggesting obfuscation or deception is a highly relevant fact in [a] totality analysis."

---

[26] At the evidentiary hearing, Defendant also appeared to question how Garcia was able to view Mix's movements through the Lexus's purportedly tinted front window that was situated under a shadowy tree. (*See* Hearing Tr. at 181:20–22.) Both Cancel and Garcia testified that the Lexus's front window was only "slightly" or "lightly" tinted. (*Id.* at 69:06–08, 151:02–05, 176:20–177:01.) While the Lexus's front window is undoubtedly tinted to some degree, Garcia's BWC footage further confirms the ability to view inside the Lexus from a frontal view. Mix—most clearly his white t-shirt—appear at least somewhat visible. (*See* Garcia BWC at 19:11:35–40.) What's more, Garcia's spontaneous pointing and shouting of "Yo, keep your hands up," as he approached the Lexus, and Mix's subsequent holding out of his wallet in explanation, corroborates that Garcia *did* view movement through the window. (*Id.* at 19:11:40–46.)

*United States v. Seabreeze*, No. 24-22, 2024 WL 2832795, at *6 (E.D. Pa. June 4, 2024) (citing

*United States v. King*, 764 F. App'x 266, 269–70 (3d Cir. 2019) (non-precedential)).

***Mix's Criminal History.*** Garcia testified that he had previously arrested Mix for

"[n]arcotics possession." (Hearing Tr. at 155:21–156:03; *see id.* at 45:10–14 (Cancel testifying

that he also previously arrested Mix "on a narcotics charge").) "[T]he use of prior arrests and

convictions to aid in establishing probable cause is not only permissible . . . but is often helpful."

*United States v. Conley*, 4 F.3d 1200, 1207 (3d Cir. 1993). This is particularly true where, as here,

"the prior offenses relate to the crime being investigated." *Green*, 897 F.3d at 187 (citing *Conley*,

4 F.3d at 1207). Thus, while the officers' familiarity with Mix's relevant arrest history is "not

sufficient to establish reasonable suspicion, it is a valid factor." *Id.*

***Nervous, Evasive Behavior.*** "[N]ervous, evasive behavior is a pertinent factor in

determining reasonable suspicion." *Wardlow*, 528 U.S. at 124. Garcia testified that Mix appeared

"hesit[ant]" and "ang[ry]" when Garcia asked him to lower the Lexus's windows. (Hearing Tr. at

155:02–05; *see* Garcia BWC at 19:12:13–19:12:23 (Mix responding "[d]on't act like an asshole"

to Garcia's requests to lower the Lexus's windows).) Further, Garcia's BWC footage depicts Mix

yelling at the officers to call their supervisor because he "was not stepping out of his car." (Garcia

BWC at 19:13:35–19:14:45.) Once Cancel approached the Lexus, he too observed Mix to be "very

argumentative" and "upset." (Hearing Tr. at 46:10–17.) Garcia testified that he viewed Mix's

obstinance as Mix "trying to throw [the officers] off [their] game . . . and that he was nervous after

[they] asked him out of the car." (*Id.* at 165:02–10.) Because Cancel believed he had a "pretty

decent rapport" with Mix based on their prior interactions, Cancel also viewed Mix's reaction to

being asked to exit the Lexus "surprising." (*Id.* at 46:24–47:01, 47:20–22.) Thus, Mix's behavior

upon initially interacting with the officers—including resisting their requests, cursing at them, and asking for their supervisor—only caused the officers' suspicions to rise rather than recede.

Although each of the above factors, alone, may not have been sufficient to support a finding of reasonable suspicion, reasonable suspicion cannot be "defeated by a so-called 'divide-and-conquer' analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each." *Green*, 897 F.3d at 183 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018)). Officers observed Mix's Lexus to be double-parked two to three car lengths away from another double-parked vehicle in a high-crime narcotics area. Garcia saw Mix, who he knew from a prior narcotics arrest, making "furtive" movements consistent with concealing contraband, after which Mix appeared nervous, as well as aggressive and obstinate.

In its analysis, the Court must "give considerable deference to police officers' determinations of reasonable suspicion," *United States v. Brown*, 765 F.3d 278, 290 (3d Cir. 2014) (citation omitted), and will not, from where it sits, dismiss or second-guess the actions of well-trained officers in a fast-evolving situation with public safety implications. *Green*, 897 F.3d at 187. Under the "totality of the circumstances," the Court finds that the factors discussed hereinabove supported a determination of reasonable suspicion that Mix was engaged in criminal activity beyond that of a traffic violation such that "extending the traffic stop to facilitate a dog sniff was permissible." *Id.*

### 3. Bases for Probable Cause

While reasonable suspicion was sufficient to conduct an investigatory stop, probable cause was required to actually search Mix's Lexus. *See United States v. Butenko*, 494 F.2d 593, 604 (3d Cir. 1974) ("[S]ome form of probable cause for [a] search and seizure must exist."). As a precursor to the search of Mix's Lexus, the Government contends that the results of K-9 Koen's investigation created sufficient probable cause to obtain the search warrant that subsequently led officers to

locate and seize the handgun and ammunition. Defendant challenges both K-9 Koen's positive alert and the search warrant itself as proper bases for the search.

i.    *K-9 Koen's Investigation*

Defendant challenges Koen's "reliability, certification, and training as a drug detection dog." (Mot. Br. at 26.) He questions the reliability of Koen's positive alert specifically because there was marijuana and dog food located in Mix's vehicle at the time of Koen's sniffing. (*Id.*) Relevantly, the dog food was located on the rear driver-side passenger's seat, which is where Koen alerted. (Katz Report.) Separately, Defendant argues Koen is unreliable because his alert did not result in the discovery of any narcotics in the Lexus. (Mot. Br. at 26.)

"The Supreme Court has held that a K-9 dog's alert provides probable cause to believe that a vehicle contains contraband, and therefore to search that vehicle, as long as the dog has been properly trained or certified." *Richardson*, 2016 WL 223705, at *5 (citing *Florida v. Harris*, 568 U.S. 237, 248 (2013)). In *Harris*, the Supreme Court explained:

> evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs. After all, law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources.

*Harris*, 568 U.S. at 246–47.

The evidentiary hearing dispelled any uncertainty regarding Koen's credentials. Indeed, his handler, Katz, repeatedly testified that Koen was specifically trained *not* to alert to the odor of dog food or marijuana.

Katz testified that he had been working with Koen for approximately five years at the time of Mix's stop and that the pair was called to conduct sniffing investigations "approximately 20 times per year." (Hearing Tr. at 107:13–108:09.) With respect to training, Katz testified that upon being selected as a K-9 handler, he spent a year in "the K-9 academy," where he went through basic obedience training and bonding with Koen, followed by narcotics training. (*Id.* at 98:05–25.) With respect to narcotics training itself, Katz testified as to how Koen was trained to identify controlled substances:

> So in the beginning we start with a small tin can placed in the middle of our training room with a CDS, a narcotic, inside a can. At that time, we release the dog and let the dog's own curiosity bring him to the can. When the dog reaches the can and smells it, we have a clicker. We'll push that clicker and then give the dog food as a reward. It's just tons of repetition doing that. Then after that, then we'll start adding other cans, so we have the one with the narcotic odor in it and then we'll put one with nothing in it. And then we'll take that and add another can with nothing [in] it. After that, we'll add another can with nothing in it. So we'll constantly move the placement of the cans. After the dog understands the so-called game, that he knows like, I have to smell this odor in order to get my reward, we move to -- we have a scent wall which has approximately 80 canisters on the wall. From there, we will put -- they're PVC round canisters with holes in them. We put a narcotic in there, and what we do is we proof the dog off other odors.

(*Id.* at 100:03–24.)

Importantly, Katz explained that Koen was taught to *not* hit on "distracter odors." (*Id.* at 101:22–102:01.) He confirmed that both food and marijuana are used as distractor odors. (*Id.* at 102:10–16 ("We'll actually use the dog's ball and put it in there so he doesn't indicate on the ball. As I just said, rubber bands, plastic bags, wax glassines, tinfoil, alcohol pads, real people food.")) The following testimony is on point:

> Q: [W]ould your dog hit on marijuana?
>
> A: Absolutely not. We use marijuana as a distractor odor[.]

*Id.* at 103:09–11.

40

Q: Is it possible—'possible' being the keyword—that Koen could have shown interest in the dog food but not have alerted?

A: No, ma'am, I don't believe so.

Q: That he wouldn't have shown any interest in the food?

A: Not in the dog food, no.

*Id.* at 134:13–17.

Katz explained that Koen was only trained to detect five odors: heroin, cocaine, crack cocaine, methamphetamines, and ecstasy. (*Id.* at 102:19–24.) He explained that he and Koen would go through two trainings a minimum per month, up to "once a week." (*Id.* at 108:19–24.) He elaborated that they would attend trainings with trainers employed by the Passaic County Sheriff's Office but would also attend "training seminars" with other municipalities. (*Id.* at 109:02–109:16.) Each training was "dedicated half [to] narcotics, half to patrol." (*Id.* at 109:24–110:02.)

At the evidentiary hearing, the Government introduced a number of exhibits reflecting Koen's certifications. Katz discussed four certifications from the United States Police Canine Association for the years 2019 through 2022 which were obtained by Katz and Koen "prov[ing] that [they] can detect the narcotics Koen was trained in." (*Id.* at 112:10–21; *see* Gov't Exs. 23–26.) The Government also introduced seven certifications from both the Passaic County Sheriff's Office and Morris County Sheriff's Office indicating the search tests Koen passed or failed. (Hearing Tr. at 114:01–118:24; *see* Gov't Exs. 15–22.) These certifications dated between January 2018 (Gov't Ex. 16) and December 2023 (Gov't Ex. 21), indicate over 100 "passes" by Koen and four "fails" in terms of search tests. (*See* Gov't Ex. 17 at 2 (failure to detect 50 ecstasy pills under a utility truck seat); Gov't Ex. 18 at 2 (failure to detect no more than one gram of narcotics under a bedroom table); Gov't Ex. 19 at 2 (failure to detect 36 grams of cocaine inside the brake rotor of a vehicle); Gov't Ex. 22 at 2 (failure to detect five folds of heroin behind a bar in a cabinet).) Katz

and Koen had "passed all of [their] certifications" at the time of Mix's stop. (Hearing Tr. at 118:21–24.)

Defendant did not rebut any of Koen's trainings or certifications to suggest that his alert could not be trusted. *See Harris*, 568 U.S. at 248 ("If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause."). Indeed, the sole basis that Defendant cites here in an attempt to cast Koen's alert as unreliable was his purported "false" alert in this very case, where Koen positively alerted at the rear driver-side passenger's door, but no narcotics were ultimately located in Mix's vehicle. (*See, e.g.*, Hearing Tr. at 135:14–15; Def. Supp. Br. at 11.) However, "a false alert does not mean necessarily that the dog alerted without detecting any odor of narcotics. Dogs are capable of detecting narcotics residue that may appear on money or clothing that has come in contact with drugs, even though no seizable quantity has been found." *United States v. Kennedy*, 131 F.3d 1371, 1375 n.6 (10th Cir. 1997); *see Harris*, 568 U.S. at 245–46 ("[I]f the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person.").

Katz explained that when Koen detects the odor of one of the narcotics he is trained on, Koen will "sit and point his nose in the direction he's detecting that odor from, or he can lay down and point in that direction where he's detecting that odor from. Or just show a basic body—behavioral change." (Hearing Tr. at 110:13–22.) Thus, when Koen sat at the rear driver's side door of the Lexus, Katz understood that to signify "[t]he presence of narcotic odor." (*Id.* at 128:03–04; *see* Garcia BWC at 19:41:50–19:46:05.) This positive alert "gave the officers probable cause to

42

believe that the [Lexus] contained contraband and to search the vehicle."[27] *Richardson*, 2016 WL 223705, at *5; *see Morgan v. Borough of Fanwood*, No. 11-7513, 2015 WL 4112135, at *8 (D.N.J. July 7, 2015) ("Third Circuit precedent confirms that a dog's positive alert is sufficient to establish the probable cause necessary for a search[.]" (collecting cases)). The Court credits Koen's training and expertise and finds his positive alert for the presence of narcotics to be reliable for purposes of establishing probable cause as premised by, or without and independent of, the judicially-authorized search warrant, even without locating the presence of narcotics thereafter.

Defendant separately argues that Koen unconstitutionally searched the inside of the Lexus when he twice jumped up onto the Lexus's open windowsills. *See, e.g.*, Reply at 26; Mot. Br. at 26 ("[T]he repeated physical intrusion upon the exterior and interior of the car [] constitute unconstitutional trespasses upon Mr. Mix's property interests.").) "Consistently the Supreme Court has held that an *exterior* canine sniff of a car during a lawful traffic stop does *not* amount to a 'search' under the Fourth Amendment." *United States v. Pierce*, 622 F.3d 209, 213 (3d Cir. 2010) (collecting cases). However, "*interior* sniffs may become constitutionally infirm in the event that the interior sniff is accomplished or facilitated by the officer-handler." *United States v. Hutchinson*, 471 F. Supp. 2d 497, 508 (M.D. Pa. 2007) (emphasis added), *aff'd*, 316 F. App'x 137 (3d Cir. 2009).

As for Koen's second jump on the front driver-side windowsill, both Garcia and Katz agreed that Koen inserted at least his snout into the vehicle.[28] (Hearing Tr. at 189:09–12, 130:18–

---

[27] Garcia's search warrant affidavit does not explicitly state Koen's training and credentials. (*See* Def. Ex. A at 3–6.) Defendant does not appear to contest this issue directly in his briefing, but for the avoidance of doubt, the Court notes that the Third Circuit has "never created such a rule" that "absent specific facts in the warrant establishing a dog's reliability, [it] cannot consider a positive dog sniff as part of the 'substantial basis' for probable cause." *United States v. Rivera*, 347 F. App'x 833, 837 (3d Cir. 2009).

[28] As for Koen's first jump on the front passenger-side windowsill, BWC footage—which, notably, was not entered into evidence at the evidentiary hearing—is not clear as to whether Koen's head even breaches the interior of the Lexus. (*See* Mot. Br. Ex. E at 19:42:52–19:42:54.)

20.) On Garcia's BWC footage, Katz can be seen pointing to the front driver-side door handle for Koen to sniff, at which point Koen jumps up to the windowsill of the open window and sticks his head into the vehicle for approximately four seconds. (Garcia BWC at 19:44:17–25.) Yet, "[w]here decisions have held that an interior sniff was unconstitutional, the courts have concluded that the officer '*facilitated or encouraged*' the dog's entry into the car." *Pierce*, 622 F.3d at 214 (emphasis added). The "natural migration" of initial exterior sniffs does not constitute an unconstitutional search. *Id.* at 214–215 (upholding interior dog sniff where the dog "acted instinctively and without facilitation by his handler").

Katz testified that he did not instruct Koen to jump up onto the windowsill and that he has no control if Koen does jump. (Hearing Tr. at 128:08–13.) Further, Koen was not trained to jump: "Koen is trained in—pattern trained to search up and down, up and down. So he's trained to go up and down, but he's not trained to jump up on a windowsill, to put his paws in there, to stick his head in the window. He did that on his own." (*Id.* at 130:13–17.) There is no evidence to suggest Koen's entry through the windows was facilitated or encouraged by Katz, whose hand remained firmly pointed at the edge of the driver's door while Koen sniffed. (*See* Garcia BWC at 19:44:17–25; Reply Br. at 26 (stating the Court "must [] consider whether the dog's actions are attributable to the officer, and thus a violation of the Fourth Amendment's prohibition of reasonable searches.").)

Defendant argues that *Pierce*'s "natural migration" rule is only applicable where a K-9 alerts *prior* to the migration.[29] (Reply Br. at 26.) However, the Court does not read *Pierce* to require

---

[29] While Koen did not "alert" *per se*, Katz testified that Koen's "spin at the trunk" of the Lexus during his first time rounding the vehicle signified that he may have "caught something." (Hearing Tr. at 131:02–132:20 ("Right off the bat, when he first went, his spin at the trunk—he usually goes around the car up and down. When he spun back around, that's a behavior change, and that's why I focused most of my attention on that door, because as soon as he passed that door, he caught something. He went right back to it.").)

an alert as a condition precedent. *See Pierce*, 622 F.3d at 215 (concluding that K-9's interior sniffs were the "natural migration from his initial exterior sniffs," and "did not constitute a search requiring a warrant or probable cause"); *United States v. Humphries*, 504 F. Supp. 3d 464, 472 (W.D. Pa. 2020). So too here, there is no evidence to support that Koen's interior sniffs were anything more than a "natural migration" of his exterior sniffs, and thus his investigation does not offend the Fourth Amendment.[30]

    ii.   *Search Warrant*

Defendant argues that the search warrant in this case was tainted "because virtually all of the facts contained in the affidavit were discovered during activity that violated the Fourth Amendment." (Mot. Br. at 28 ("A neutral justice would not have issued the search warrant in Mr. Mix's case if it did not contain the information that was obtained during the unlawful and prolonged stop of his vehicle.").) However, the Court has a different view and found that no constitutional violations occurred during Mix's stop. Both the initial stop and the extension of the stop were supported by reasonable suspicion, and Koen's positive alert provided an independent basis for probable cause to justify a search of the Lexus. Indeed, once Koen alerted, officers could have lawfully conducted a warrantless search. *See United States v. Childs*, No. 22-30, 2025 WL 1513205, at *3 (D.N.J. May 28, 2025) ("There was probable cause to search the [vehicle] under the automobile exception once the canine sniff alerted law enforcement . . ."); *United States v. Burton*, 288 F.3d 91, 101 (3d Cir. 2002) ("[F]or constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a

---

[30] The Court is unpersuaded that this finding suggests "Katz's inability to control K9 Koen." (Def. Supp. Br. at 11.) While Defendant implies Katz trained Koen to act "instinct[ively]," and thus, Katz impliedly trained Koen to conduct interior sniffs based on instinct (*id.*), there is no evidence to support this assertion in the record. In other words, there is no evidence that Koen's alerting itself, as opposed to his investigative sniffing, is based on instinct alone—on the contrary, Katz testified extensively that Koen's alerting is based on significant training as to what he should and should not alert to.

magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." (quoting *Chambers v. Maroney,* 399 U.S. 42, 52 (1970)).

Nonetheless, the officers here took an additional prophylactic step and secured a warrant from the Honorable Scott T. Rumana, J.S.C. (*See* Def. Ex. A at 1–2.) The affidavit supporting the warrant application attests to relevant facts, including the silver Chrysler and black Lexus being double-parked on the street, Mix's "furtive" movements "consistent with attempting to conceal contraband or a weapon," Mix's criminal history, and Koen's positive alert on "the left rear side fender" of the Lexus. (Def. Ex. A at 6.) Thus, "the [Superior Court judge] who issued the warrant had a 'substantial basis' for determining that probable cause existed." *Vosburgh,* 602 F.3d at 526 (quoting *United States v. Zimmerman,* 277 F.3d 426, 432 (3d Cir. 2002)).

Yet, even if the search warrant were somehow deficient, "the good faith exception instructs that suppression of evidence 'is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority.'" *United States v. Hodge,* 246 F.3d 301, 307 (3d Cir. 2001) (quoting *United States v. Williams,* 3 F.3d 69, 74 (1993)). "The mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." *Id.* at 307–308. However, there are certain situations in which the good faith exception does not trigger. *Id.* (citing *United States v. Leon,* 468 U.S. 897, 922–923 (1984)). The four situations identified by the Third Circuit are:

 (1) [when] the magistrate [judge] issued the warrant in reliance on a deliberately or recklessly false affidavit;

(2) [when] the magistrate [judge] abandoned his judicial role and failed to perform his neutral and detached function;

(3) [when] the warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; or

(4) [when] the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*Id.* (citing *Williams,* 3 F.3d at 74 n.4).

Significant to Defendant's Motion, beyond seeking suppression due to an unlawful search and seizure, he alternatively seeks suppression of the handgun and ammunition on the grounds that the warrant "affidavit include[d] deliberately or recklessly false information"—the first prong referenced above. (Mot. Br. at 31.) The Third Circuit's framework for determining what constitutes "reckless disregard for the truth" in terms of both misstatements and omissions is as follows:

> In evaluating a claim that an officer both asserted and omitted facts with reckless disregard for the truth, we hold that: (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting.

*Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000).

Defendant argues that there are "several instances" of deliberately or recklessly false information in the search warrant affidavit. Specifically, the affidavit "(1) erroneously refers to the tipster as a 'confidential informant' [instead of a 'citizen informant,'] (2) falsely claims the tipster provided the license plate information for Mr. Mix's car[], (3) incorrectly claims the tipster provided a time for the purported drug sale, (4) misstated the time waiting for the K9 unit, and (5) declined to mention the dog's intrusion into the car, or the presence of cannabis and a bag of dog food." (Def. Supp. Br. at 12.)

At the outset, Garcia acknowledged that misstatements in the search warrant affidavit were not intended to mislead. (Hearing Tr. at 161:12–14, 161:20–162:03.) That being said, even if the search warrant were "scrubbed" of the alleged misstatements as Defendant suggests (Def. Supp. Br. at 12–13), the warrant would still be supported by probable cause. *See United States v. Yusuf*, 461 F.3d 374, 384 (3d Cir. 2006) ("When faced with an affirmative misrepresentation, the court is

required to excise the false statement from the affidavit."). *First*, with respect to the anonymous tip, the Court has found that there was probable cause independent of *any* of the information provided by the citizen informant.[31] *Second*, with respect to the time it took Koen to arrive to the scene, Garcia acknowledged that "15 minutes" was simply "an estimation at the time." (Hearing Tr. at 161:20–25.) Even if the affidavit correctly stated "25–30" minutes instead, Defendant does not explain how this difference would be material to a probable cause determination. *See Yusuf*, 461 F.3d at 383 ("In the end, the defendant must prove by a preponderance of the evidence that probable cause does not exist under the corrected affidavit, i.e., that the deficiency in the affidavit was material to the original probable cause finding."). *Third*, Garcia did not recall observing marijuana in the Lexus prior to Koen's search (*see* Hearing Tr. at 192:05–13), and even charitably, "negligence or innocent mistake [is] insufficient" to "constitute[] a reckless disregard for the truth in [F]ourth [A]mendment cases." *Wilson*, 212 F.3d at 787 (quoting *United States v. Davis*, 617 F.2d 677, 694 (D.C. Cir. 1979)).

While Garcia recalled seeing dog food in the Lexus (Hearing Tr. at 191:02–03), it is unclear how inclusion of this information—or even information regarding the marijuana—would change the probable cause analysis. *See Yusuf*, 461 F.3d at 384 (noting a court determines whether an omission is "material" to a probable cause finding by removing the "falsehood created by an omission [and] supplying the omitted information to the original affidavit" (citation omitted)).

---

[31] Garcia does not attempt to fluff or bolster the supposed informant's credibility. There is no reference in the affidavit as to any other investigations the informant purportedly assisted law enforcement with, what was yielded as a result of the informant's previously-disclosed information, or whether the informant's information *ever* resulted in a prior arrest or prosecution. In short, aside from arguably misidentifying the tipster as a "confidential" informant rather than a "citizen" informant and attesting matter-of-factly to the uncorroborated information that the tipster had witnessed a narcotics transaction between Mix and E.W. the prior day (*see* Def. Ex. A at 4), there is no reference whatsoever in the warrant affidavit that the tipster's past disclosures were used by law enforcement in any other investigations or prosecutions, and thus the risk that this information affected the Superior Court in its determination of probable cause to issue the warrant in any material way is *de minimis* and highly remote.

Referencing the dog food and marijuana would not have been material, as Koen is not trained to alert on either item. (*See* Def. Ex. A at 5 (writing in search warrant affidavit that a "*Narcotics* K9 was requested to the scene" and "Passaic County Sheriff's Office *Narcotics* Officer Jason Katz and K9 Koen arrived on scene . . ." (emphasis added)); *United States v. Shabazz*, No. 12-64, 2012 WL 2871801, at *5 (M.D. Pa. July 12, 2012) ("[T]he reasonable inference is that [K-9] is a qualified drug detection dog.").

Additionally, it is not clear as to how Koen's seconds-long purported intrusions of his snout into the Lexus—which Garcia witnessed (Hearing Tr. at 188:16–19, 189:09–12) but were not facilitated or encouraged by Katz—would have affected the probable cause analysis, as the "natural migration" of initial exterior sniffs does not constitute an unconstitutional search. *Pierce*, 622 F.3d at 214–215.

Thus, even if the search warrant affidavit (i) did not reference any information provided by the tipster; (ii) stated it took 25 to 30 minutes for Koen to arrive; (iii) referenced the dog food and marijuana in the Lexus; and (iv) referenced Koen's windowsill jumps, the affidavit accurately attested to (i) the silver Chrysler and black Lexus being double-parked on the street, (ii) Mix's "furtive" movements "consistent with attempting to conceal contraband or a weapon," (iii) Mix's criminal history, and (iv) Koen's positive alert on "the left rear side fender" of the Lexus.[32] (Def. Ex. A at 5.) Taken together, this would still be sufficient for the warrant to issue.

In sum, the search of Defendant's Lexus and the ultimate recovery of a handgun and ammunition therein were not unconstitutional. *First*, police had reasonable suspicion to stop Mix

---

[32] For this reason, Defendant would not have been entitled to a separate *Franks* hearing as to the warrant. (Mot. Br. at 29–31); *United States v. Desu*, 23 F.4th 224, 234 (3d Cir. 2022) ("To obtain a *Franks* hearing, a defendant must establish (1) that a warrant application contained false statements made with reckless disregard for the truth and (2) that the remaining truthful statements, standing alone, do not establish probable cause.").)

based on a double-parking traffic violation. *Second*, police had reasonable suspicion to prolong

Mix's stop for further investigation based on a combination of the known high-crime area,

Defendant's criminal history, his furtive movements, his demeanor, and his uncharacteristically

nervous and aggressive, agitated behavior. *Third*, K-9 Koen's positive alert sufficiently formed the

basis for probable cause. *Finally*, the search warrant itself was supported by probable cause, even

when accounting for any purported factual inaccuracies. Under the applicable preponderance of

the evidence standard, it is clear the search of the Lexus and subsequent seizure of a handgun and

ammunition were not unlawful. *See United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974)

("[T]he controlling burden of proof at suppression hearings should impose no greater burden than

proof by a preponderance of the evidence.").

Therefore, Defendant's Motion insofar as it seeks to suppress all evidence obtained as a

result of the unconstitutional stop of Mix and as a result of a purportedly tainted search warrant is

**DENIED**.

### C. MOTIONS FOR DISCOVERY AND OTHER DISCLOSURES

The remaining requests in Defendant's Motion are for discovery and other related

disclosures. Because the majority of Defendant's requests are premature, moot, or baseless, the

Court disposes of them quickly:

***Motion to Disclose the Identity and Information Regarding the Anonymous "Citizen***

***Informant."*** Because the Court found the tip by the citizen informant to be unreliable and thus

irrelevant to its determination of probable cause, Defendant cannot meet his burden to show that

disclosure would be "relevant and helpful to the defense of an accused, or [] essential to a fair

determination of a cause." *United States v. Jiles*, 658 F.2d 194, 196, 198–199 (3d Cir. 1981)

(noting disclosure should occur where "(1) the possible testimony was highly relevant; (2) it might

have disclosed an entrapment; (3) it might have thrown doubt upon the defendant's identity; [or]

(4) the informer was the sole participant other than the accused, in the transaction charged."). Disclosure would not outweigh "the Government's interest in maintaining the confidentiality of its informant," *id.* at 198, where the informant is not even alleged to have witnessed the criminal activity underlying Defendant's § 922(g)(1) charge. Thus, Defendant's Motion in this respect is **DENIED**.

*Motion to Require the Government to Disclose All Brady and Related Exculpatory Material.* Because the Government acknowledges its "continuing obligation" under *Brady* and asserts that it "has complied with its obligations thus far," Defendant's Motion is **DENIED** with respect to *Brady. See United States v. Mangan*, 747 F. Supp. 3d 740, 747 (D.N.J. 2024) ("Because the Government has and will continue to comply with its *Brady* obligations, and [Defendant] has not directed the Court to contrary facts, the motion is denied on this basis.").

With respect to Defendant's requests for identifying information for "all agents and law enforcement personnel involved in the investigation of this matter or in the arrest of Mr. Mix," the Government's "*Giglio* obligations extend only to witnesses who will testify at trial." *United States v. Miller*, No. 15-202, 2016 WL 1408102, at *4 (D.N.J. Apr. 11, 2016). Because the Government has agreed to voluntarily disclose *Giglio* material prior to trial and will produce identifying information "[t]o the extent such information is *Brady, Giglio*, or should be produced pursuant to the Government's discovery obligations," Defendant's Motion is **DENIED** in this respect. (Opp. Br. at 56); *United States v. Graham*, No. 21-645, 2022 WL 4132488, at *6 (D.N.J. Sept. 12, 2022), *aff'd*, No. 23-3197, 2025 WL 342190 (3d Cir. Jan. 30, 2025).

Finally, with respect to law enforcement personnel files, although *Brady* "mandates that the prosecution disclose impeachment material that is exculpatory to the defendant, it does not require that the prosecution make the file available for the defendant's general perusal." *United*

*States v. Dent*, 149 F.3d 180, 191 (3d Cir. 1998). "Instead, the government need only direct the custodian of the files to inspect them for exculpatory evidence and inform the prosecution of the results of that inspection, or, alternatively, submit the files to the trial court for *in camera* review." *Id.* While the Court reads the Government's briefing to represent that it will review personnel files and disclose any *Brady* or *Giglio* materials, for the avoidance of doubt, the Court **GRANTS** Defendant's Motion insofar as it requests the disclosure of *Brady* or *Giglio* material found in the relevant law enforcement personnel files. *United States v. Brassington*, No. 09-45, 2010 WL 3982036, at *16 (D.N.J. Oct. 8, 2010).

*Motion for Disclosure of Federal Rule of Evidence 404(b) and Jencks Act Materials, as well as the Preservation of Rough Notes*. The Court generally determines the dates for disclosure of Rule 404(b) evidence and Jencks Act materials "after a final pre-trial conference between the parties." *United States v. Edwards*, No. 20-00572, 2024 WL 1620311, at *3 (D.N.J. Apr. 15, 2024). Pursuant to the District Of New Jersey's Standing Order 15-2 ¶ 17, the final pretrial conference should occur "no sooner than two weeks following the disposition of pretrial motions." Thus, as no date has yet been set for either the final pretrial conference or trial itself, Defendant's Motion insofar as it requests early disclosure of Rule 404(b) evidence and Jencks Act materials is **DENIED**. The Court "will instead set a time for th[ese] disclosure[s] at the final pretrial conference." *United States v. Figueroa*, No. 14-672, 2021 WL 1661202, at *10 (D.N.J. Apr. 28, 2021). Nonetheless, "the Court encourages the Government to continue to provide Defendant with Jencks materials in a sufficiently timely manner to permit counsel an opportunity to prepare for cross-examination of Government witnesses." *Id.*

Still, Defendant's Motion is **GRANTED** insofar as it seeks the preservation of law enforcement rough notes and draft reports pending disclosure or the Court's determination of non-

disclosure. *United States v. Ammar,* 714 F.2d 238, 259 (3d Cir. 1983) ("[T]he government must retain and, upon motion, make available to the district court both the rough notes and the drafts of reports of its agents to facilitate the district court's determination whether they should be produced.").

    ***Motion to Require the Government to Disclose Expert Reports, Qualifications, and Summaries***. The basis for Defendant's Motion—which would have the Court re-order a disclosure that was long ago already ordered (ECF No. 16 ¶ 1 (requiring production of expert discovery under Federal Rule of Criminal Procedure 16(a)(1))—is unclear. Thus, the Motion is **DENIED** insofar as it requests the disclosure of items already covered by the entered Scheduling Order (*Id.*) To the extent Defendant implies that any future scientific or expert disclosures by the Government would be untimely under the Scheduling Order, and therefore should be excluded from trial, Defendant may raise that issue if and when these hypothetical future disclosures occur.

    ***Motion for a Hearing to Determine Admissibility of Prior Convictions under Federal Rule of Evidence 609(a)***. The Court will not engage with the parties' substantive arguments on this topic at this time. Rather, as the Government does not appear to object, the Court will **GRANT** Defendant's request for a hearing. The date for the hearing will be set at the same time that the trial date is set and will take place no later than one week before trial commences.

    ***Motion to Permit Additional Motions as Reasonably Necessary***. Defendant's Motion is **GRANTED** insofar as any new motions must be based on newly-discovered information.

## **CONCLUSION**

For the foregoing reasons, Defendant's Motion (ECF No. 21) is **GRANTED** in part and

**DENIED** in part. An appropriate Order will accompany this Opinion.

_____

**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

<u>Dated</u>: September 25, 2025

54